**Stephen THOMPSON, Appellant
(Defendant Below),**

v.

**STATE of Indiana, Appellee
(Plaintiff Below).**

No. 46S00–9902–CR–100.

Supreme Court of Indiana.

May 19, 2000.

---

Donald W. Pagos, Michigan City, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Randi E. Froug, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

·BOEHM, Justice.

After two trials ended in hung juries, Stephen Thompson was convicted in a third trial of the murder of Alan "Scott" Fritzen and sentenced to sixty-five years imprisonment. In this direct appeal he contends (1) the trial court erred in rejecting his tendered instruction on circumstantial evidence; (2) there is insufficient evidence to rebut his alibi defense; (3) the trial court erred in several evidentiary rulings; and (4) the elected judge did not have authority to preside over his retrial

after a senior judge had presided over the first trial. We affirm the trial court.

### Factual and Procedural Background

In the summer of 1996, Scott and Maryanne Fritzen bought the Paradise Lounge in Michigan City. Thompson was retained as the doorman and in September or October began an affair with Maryanne. After Thompson and Maryanne were involved in an accident in Scott's vehicle, Scott fired Thompson and barred him from the lounge. Thompson then went to Milwaukee to stay with his sister, Pearline Thompson.

On November 22, 1996 at approximately 11:00 a.m., an employee found Scott's dead body inside the lounge. He had been shot in the back of the head with a single bullet of approximately .32 caliber. There was no sign of forced entry or a struggle. A shotgun that had been kept at the bar was missing.

The investigation soon focused on Thompson. Pearline initially told police that Thompson was in Milwaukee at the time of the murder, but later changed her story. At trial, Pearline testified that Thompson came to stay with her in November of 1996 and told her of his affair with Maryanne. Thompson told her that Scott and he used to "get into it a lot and [Scott] was threatening him." Thompson stated that he would "do" Scott before Scott "did him." He also told Pearline that he would wait outside the bar for Scott and wear "throw-away clothes." He showed her a "little handgun" with two barrels. On November 21, Thompson borrowed Pearline's car to drive to Michigan City. He left at about 10:30 p.m. and did not return until approximately 7:00 a.m. the following morning. After his return to Milwaukee, Thompson told Pearline that he "took care of business" in Michigan City.

One of Pearline's neighbors, Otis Easley, told Milwaukee police that Thompson had hidden a shotgun under Easley's porch and had also attempted to sell him a Derringer handgun. The shotgun was recovered from under the porch and determined to be the weapon taken from the Paradise Lounge. Police also discovered a live .32 caliber bullet manufactured by the Federal Cartridge Company on the floor of Thompson's car. An Indiana State Police toolmark examiner compared that bullet with the one recovered from Scott's body and concluded that the two were manufactured by the same company and bore the same unusual striations caused by the manufacturing process. The examiner testified that he test-fired bullets from a double barreled Davis Industries Derringer and that the test-fired bullets had the same class characteristics as the fatal bullet.

Thompson was charged with murder. A jury found him guilty, and the trial court sentenced him to sixty-five years imprisonment.

### I. Circumstantial Evidence Instruction

■ Thompson first contends that the trial court erred in refusing his tendered instruction on circumstantial evidence. Although the trial court instructed the jury on the definitions of both direct and circumstantial evidence, it refused to instruct the jury, "Where proof of guilt is by circumstantial evidence only, it must be so conclusive in character and point so surely and unerringly to the guilt of the accused as to exclude every reasonable theory of innocence." *See* 2 *Indiana Pattern Jury Instructions (Criminal)* 12.01 (2d ed.1991).

Thompson concedes that a "direct confession of a crime to a third person" is direct evidence that obviates the need to give this tendered instruction, *see Chapman v. State,* 556 N.E.2d 927, 931 (Ind. 1990), but contends that the instruction was necessary in his case because he never made a "direct confession" to the murder. The State responds that Thompson's statements to Pearline "strongly imply" his guilt, and this is sufficient to constitute direct evidence. *See Barajas v. State,* 627 N.E.2d 437, 439 (Ind.1994). We agree with the State that a defendant need not use the explicit language, "I killed X," in

order for a less than explicit admission of guilt to be considered direct evidence. We also agree that the statements Thompson made to Pearline, which she recounted at trial, sufficiently clearly implied Thompson's guilt to constitute direct evidence.

Thompson also contends, as he did in the trial court, that the jury could choose to disbelieve Pearline, and if it did, the evidence against him would then be entirely circumstantial. Thus, he contends the instruction should have been given to provide the jury with the relevant law to apply if it decided to disbelieve Pearline's testimony. If the only direct evidence is a witness whose credibility has been seriously questioned, e.g., a cellmate who has received a substantial benefit from the State in exchange for testifying, it is certainly within the trial court's discretion to give the instruction. Thompson's contention, however, would require this instruction in every case in which there is any circumstantial evidence, because the remaining evidence could be disbelieved or discredited. Here, because there was some direct evidence of Thompson's guilt, the trial court was within its discretion in refusing Thompson's tendered instruction.

## II. Sufficiency of the Evidence

■ Thompson next contends that there is insufficient evidence to rebut his alibi defense. Our standard of review for sufficiency claims is well settled. We do not reweigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Taylor v. State,*

681 N.E.2d 1105, 1110 (Ind.1997). The State is not required to rebut directly a defendant's alibi but may disprove the alibi by proving its own case-in-chief beyond a reasonable doubt. *Lott v. State,* 690 N.E.2d 204, 209 (Ind.1997).

Based on his timeline of the evening of the killing, Thompson contends that the "uncontroverted" evidence at trial established that it was impossible for him to have killed Scott. We disagree. Pearline testified that Thompson left Milwaukee at approximately 10:30 p.m. and returned around 7:00 a.m. A State's witness testified that the drive from the Paradise Lounge to Pearline's house took him three hours and twenty minutes.[1] Scott was last seen alive at approximately 3:00 a.m. In light of this evidence, Thompson had a forty-minute window (between 3:00 a.m. and 3:40 a.m.) in which to enter the lounge and shoot Scott before returning to Milwaukee.[2] There was sufficient evidence to rebut Thompson's alibi that he was in Milwaukee at the time of the killing.

## III. Evidentiary Rulings

Thompson also challenges several evidentiary rulings of the trial court.

### A. *Evidence Rule 404(b)*

■ Thompson contends that the trial court erred in admitting character evidence prohibited by Indiana Evidence Rule 404(b). At trial the State sought to present testimony that Thompson had attempted to sell Easley a Derringer handgun some number of days before Scott was shot. Easley's testimony is not clear as to the precise date of this conversation, but it appears to have occurred between a day and a week before Scott's murder. Be-

---

1. The witness did not testify as to the speed at which he was driving.

2. Thompson contends "the Pathologist testified the time of death was between 3:30 a.m. and 11:00 a.m." This misstates the record. Defense counsel asked the pathologist to "[a]ssume that Mr. Fritzen were last seen alive at 3:30 in the morning, and was not discovered dead until 11:00 a.m. the next day.

Where would you be able to set the time of death?" Accepting defense counsel's factual predicate, the pathologist agreed that she would not be able to narrow the time of death any further. In any event, even if Thompson killed Scott at 3:30, he would still have had sufficient time to return to Milwaukee before 7:00 a.m.

cause the conversation occurred before the murder, Thompson contends that it has no relevance: "this was not a case of Thompson trying to get rid of the murder weapon." At trial Thompson contended that the proffered testimony was inadmissible because

> [i]t simply goes to show bad character or the propensity to commit a crime. It has absolutely no relevancy because [the State] cannot tie it into the murder weapon. It shows [Thompson's] a bad guy because he's got weapons in his possession, but unless they can tie it into the murder weapon, it's irrelevant. . . .

The murder weapon was never recovered. However, the tool-mark examiner testified that he test-fired bullets from a double barrel Davis Industries Derringer and that the test-fired bullets had the same class characteristics as the bullet recovered during Scott's autopsy. Pearline testified that in November of 1996 Thompson showed her a "little handgun" with two barrels.

■ Evidence Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

"The list of 'other purposes' in the Rule is not exhaustive; extrinsic act evidence may be admitted for any purpose not specified in Rule 404(b) unless precluded by the first sentence of Rule 404(b) or any other Rule." *Thompson v. State*, 690 N.E.2d 224, 233 (Ind.1997). Access to the murder weapon is such a permissible purpose. *Id.*

■ In assessing admissibility of 404(b) evidence the court must (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule

403. *Hicks v. State*, 690 N.E.2d 215, 221 (Ind.1997). Thompson points to no danger of unfair prejudice, other than a generalized concern that selling a weapon may be viewed unfavorably. This possibility is clearly outweighed by the probative value of testimony that Thompson had access to a weapon of the type used in the murder. The trial court did not abuse its discretion in allowing Easley's testimony on this point.

### B. *Evidence Rule 612*

#### 1. *Pearline's Deposition*

■ In cross-examination of Pearline, Thompson attempted to use a deposition of Pearline to refresh her recollection. Thompson handed the deposition to Pearline and asked her to look through it. The State objected on the basis that the deposition could not be admitted unless Thompson was impeaching the witness. Thompson responded that he was using the deposition to refresh Pearline's memory. The trial court sustained the objection because Pearline "didn't prepare the deposition" and asked defense counsel to take the deposition away from the witness.

■ Although Evidence Rule 612(a) clearly envisions the use of writings to refresh a witness's memory, it "does not address the method by which the witness's memory may be refreshed." 13 Robert Lowell Miller, Jr., *Indiana Practice* § 612.101, at 225 (2d ed.1995). We agree with Judge Miller that a "simple colloquy" is all that is required under Rule 612:

> The witness must first state that he does not recall the information sought by the questioner. The witness should be directed to examine the writing, and be asked whether that examination has refreshed his memory. If the witness answers negatively, the examiner must find another route to extracting the testimony or cease the line of questioning.

*Id.* at 226 (internal citation omitted). Evidence Rule 612 does not suggest, much less require, that the writing used to re-

fresh a witness's memory must have been prepared by the witness.

■ Before the adoption of the Indiana Rules of Evidence, this Court had long held that a writing used to refresh a witness's memory could be prepared by the witness or another person. *See Gaunt v. State*, 457 N.E.2d 211, 216 (Ind.1983) (quoting *Clark v. State*, 4 Ind. 156, 157 (1853)). In *Gaunt*, we found no abuse of discretion when the trial court allowed the State to use a witness's deposition that was prepared more than a year after the crime. 457 N.E.2d at 216. It was error to refuse to permit Thompson to use Pearline's deposition to refresh her recollection. Nevertheless, as this Court explained in *Fleener v. State*, 656 N.E.2d 1140, 1142 (Ind.1995), "an error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *See* Ind. Trial Rule 61. Thompson did not include the deposition in the record and made no offer of proof. He points to nothing in the deposition that was not covered in the witness's testimony. Accordingly, there is no showing that the trial court's erroneous ruling affected Thompson's substantial rights.[3]

## 2. *Easley's Statement to Police*

■ Thompson also contends that the trial court erred in admitting a copy of Easley's statement to police. On direct examination Easley was asked when the conversation with Thompson about the Derringer had occurred. Easley responded, "I think it was like the early part of December." Defense counsel then began cross-examination by asking Easley about a statement he had given to police in early December and handed the witness a copy of that statement "to refresh his memory." The State insisted that the statement should be marked and introduced into evidence, and the trial court agreed that defense counsel had "something in front of the witness that's not an exhibit." It concluded that defense counsel should have the witness identify the document before giving it to him. Thompson abandoned his attempt to refresh the witness's recollection with the document, but on redirect the State moved for admission of the statement to police. Thompson objected on the ground that the statement need not be shown to the witness[4] and also pointed out that, because he had asked the witness about only a small part of the statement, this would not render the entire statement admissible. The trial court overruled the objection and admitted the entire eight-page statement. When asked for the basis of its ruling, the trial court responded that defense counsel had shown the statement to the witness first.

■ Evidence Rule 612(a) provides that an adverse party is entitled to have a writing used to refresh a witness's memory

---

3. Thompson also contends that the trial court erred in limiting his cross-examination of Pearline about a statement she had given to Milwaukee police on December 6, 1996. Defense counsel asked if Pearline remembered telling police that she had seen Thompson with a Derringer handgun. The State objected, but stated it would withdraw its objection if Thompson introduced the statement into evidence. The State also stated that it would move for admission of the statement on redirect. Defense counsel responded, "I don't have an objection to that, Judge." The exhibit was then marked and admitted into evidence as a defense exhibit. On appeal Thompson contends that the exhibit should not have been admitted and that he was forced to move its admission in order to question Pearline about it. It is well settled that a party must make a timely objection to evidence at trial to preserve error on appeal. *See* Ind. Evidence Rule 103(a)(1). Here, Thompson not only failed to object to the evidence, but moved its admission. Any claim of error is waived.

4. Thompson was correct that under Rule 613(a) a prior statement need not be shown to the witness. However, he took the position in the trial court that the statement was being used to refresh Easley's memory (under Rule 612), not to impeach (under Rule 613). Accordingly, we analyze the claim under Rule 612.

produced at the trial in which the witness is testifying. Rule 612(c) further provides that "[a] party entitled to have a writing or object produced under this rule is entitled to inspect it, to cross-examine the witness thereon and to introduce in evidence those portions which relate to the testimony of the witness." Thus, because Thompson handed Easley the statement to refresh his recollection about the timing of the conversation about the Derringer, the State was entitled to admit the part of Easley's statement relating to that incident under Rule 612(c). *See* Miller, *supra*, § 612.301, at 233 ("The right to introduce the writing or object into evidence belongs solely to the adverse party; the party who refreshed the witness's memory cannot introduce the writing, although the 'rule of completeness' may provide a vehicle for introduction of part of the writing by the refreshing party.") (citations omitted). Although the trial court properly admitted the part of the statement used to refresh Easley's memory, it erred in admitting the remainder of the statement over Thompson's objection. Nonetheless, this error, like the previous one, was harmless. Thompson contends that the statement "contained a wealth of inadmissible evidence," but fails to point to anything in the statement that prejudiced his substantial rights.

### C. *Autopsy Photographs*

■ Thompson next argues that the trial court erred by admitting two autopsy photographs over his objection. The State initially sought admission of several photographs through the testimony of a detective who attended the autopsy. At that time the trial court admitted two photographs and sustained Thompson's objection based on Evidence Rule 403 as to the others. Later, the pathologist was asked by Thompson in cross-examination to explain "lividity." The pathologist responded, "Lividity is the pooling of blood in dependent areas of the body. So for example, if a person dies face down, the blood gravity will take effect and the blood will pool on the face, it will pool the blood or the face will become somewhat purple." On redirect the State then sought admission of two of the previously inadmissible photographs that it contended depicted the lividity of Scott's body. Thompson objected on the ground that, although he had asked the pathologist to describe lividity, it was "not related to this case." Thompson further observed that the body had been moved to an autopsy table before the photographs were taken and therefore the blood pooling in the body would presumably have shifted. The trial court admitted the photographs.

The State contends that the photographs are "relevant to the pathologist's testimony regarding the time of Scott's death." Given Thompson's alibi defense, time of death is highly relevant. However, the pathologist testified at trial that "[l]ividity is unreliable as an indicator of time of death," and there is no contrary evidence. The State also suggests that Thompson "opened the door" to the admissibility of the photographs when he asked the pathologist about lividity. It suggests that Thompson "implied by his questions" of the pathologist that lividity was somehow an indicator of the time of death. Even if this were true, the pathologist unequivocally testified that lividity is not a reliable way to determine time of death. The photographs therefore had no relevance, and the trial court erred in admitting them.

■ This error was also harmless. The jury knew that Scott's body had exhibited lividity and had seen two other autopsy photographs. Showing the jury two more photographs to illustrate a concept of no apparent relevance did not affect Thompson's substantial rights.

### D. *Autopsy Report*

■ Thompson also contends that the trial court erred in admitting an autopsy report over his hearsay objection. As this Court held in *Ealy v. State*, 685 N.E.2d 1047, 1055 (Ind.1997), autopsy reports that

do not address a "materially contested issue in the case" are admissible under Evidence Rule 803(8)(c), the public records exception to the hearsay rule. Here, as in *Ealy,* the only contested issue was who shot the victim. That issue was not addressed in the report. Accordingly, the trial court did not err in admitting it over Thompson's hearsay objection.[5]

### E. *Cumulative Error*

■ As a final point Thompson suggests that even if the individual errors were harmless, their cumulative effect requires reversal. He cites no authority in support of this proposition, and the State responds that a number of trial irregularities that do not amount to error standing alone do not collectively amount to reversible error. *See Reaves v. State,* 586 N.E.2d 847, 858 (Ind.1992); *Stonebraker v. State,* 505 N.E.2d 55, 61 (Ind.1987). Assuming for the sake of argument that under some circumstances the cumulative effect of trial errors may warrant reversal even if each might be deemed harmless in isolation, in this case it is clear that no prejudice resulted from any of the erroneous rulings and thus their cumulative effect remains at zero.

### IV. Retrial Before the Duly Elected Judge

■ Judge Walter P. Chapala has been the duly elected judge of LaPorte Superior Court No. 1 since January 1, 1991. During pretrial proceedings, both Judge Chapala and Senior Judge Donald D. Martin signed orders in Thompson's case. Senior Judge Martin presided over Thompson's first trial, but Judge Chapala presided over the second and third trials. Thompson contends that it was error "to change judges in midstream without recusal or a showing of unavailability [of Senior Judge Martin]."

Judge Chapala had the authority to hear Thompson's case by virtue of its filing in Superior Court 1, where Judge Chapala presides as the duly elected judge. According to statute, a senior judge "exercises the jurisdiction granted to the court served by the senior judge...." Ind.Code § 33–4–8–3 (1998). The statute conferred upon Senior Judge Martin the authority to hear the first trial, but the fact that Senior Judge Martin heard the first trial, for reasons unexplained in this record, in no way divests Judge Chapala of the authority to hear a subsequent trial.[6]

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and RUCKER, JJ., concur.

---

**5.** Thompson also cites the exclusions found in parts (a), (b), and (d) of Evidence Rule 803(8). However, as we found in *Ealy,* none of these apply to autopsy reports. 685 N.E.2d at 1051 n. 3.

**6.** We reject Thompson's reliance on *Floyd v. State,* 650 N.E.2d 28 (Ind.1994), and Trial Rule 63(A). *Floyd* addressed the validity of several orders or judgments entered by court officers who were allegedly not duly appointed. Here, Judge Chapala was the duly appointed judge and plainly had the authority alleged to be absent in *Floyd.* Trial Rule 63(A) provides that the judge who presides over a trial shall hear motions or make rulings "required to be made by the court relating to the evidence and the conduct of the trial or hearing after the trial or hearing is concluded." Because the first trial ended in a mistrial, there were no matters arising from the first trial on which Senior Judge Martin needed to rule.