

**FILED**

Nov 22 2023, 9:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Nicole Slivensky
Bedford, Indiana

Patrick J. Smith
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

A.L. and N.L. (Minor Children),

And

M.L. (Father) and L.L. (Mother),

*Appellants-Responents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 22, 2023

Court of Appeals Case No. 23A-JT-1076

Appeal from the Lawrence Circuit Court

The Honorable Anah H. Gouty, Magistrate

The Honorable Nathan G. Nikirk, Judge

Trial Court Cause Nos. 47C01-2211-JT-393 & 47C01-2211-JT-395

**Opinion by Judge Riley.**
Judges Crone and Mathias concur.

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Respondents, L.L. (Mother) and M.L. (Father) (collectively, Parents), separately appeal the trial court's termination of their parental rights to the minor children, N.L. and A.L. (collectively, Children).

We affirm.

## ISSUES

Parents collectively present this court with five issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court abused its discretion when it denied Parents' evidentiary requests; and

(2) Whether the trial court's Order to terminate Parents' parental rights is clearly erroneous.

## FACTS AND PROCEDURAL HISTORY

Mother[1] and Father[2] are the biological parents of N.L., born on June 15, 2017, and A.L., born on December 17, 2020. On October 11, 2021, the Indiana Department of Child Services (DCS) became involved with Parents and Children after Parents checked themselves into IU Health for a heroin detox.

---

[1] Mother is also the biological parent of two older children, A.N. and S.L., who have been adjudicated Children in Need of Services (CHINS). A.N. is living with Mother's godmother and S.L. is under a guardianship with his paternal grandmother. Neither child has been in Mother's care for five years.

[2] Father is also the biological parent of a daughter, who resides with her mother in Bloomington, Indiana.

Two days later, DCS removed Children on an emergency basis and placed them in the care of their maternal great-grandmother (Grandmother). On October 14, 2021, DCS filed its petition to adjudicate Children in Need of Services (CHINS), alleging that Parents had a history of heroin abuse, that in early October Parents were impaired and admitted to relapsing, that Mother used heroin in the presence of Children, that Parents were evicted from their home, and that Parents were admitted to the hospital on October 7, 2021 due to suspected overdoses. On January 7, 2022, after Parents stipulated to the allegations in DCS's CHINS petitions, the trial court adjudicated Children to be CHINS. One month later, on February 7, 2022, the trial court entered a dispositional decree, ordering Parents to participate in services, including random drug screens, supervised visitation, home-based casework, Fatherhood Engagement for Father, substance abuse evaluation and all recommended services, and recovery coaching. Children have remained outside Parents' care since their removal on October 13, 2021.

[5] Although Parents attended all child and family team meetings (CFTM) and visited Children, Parents failed to address their substance abuse issues and continued to use illegal substances. Parents have "severe opiate addictions" and they "feel physically ill" when not using illegal drugs. (Appellant's App. Vol. II, p. 26). Father "feels normal when he uses heroin or fentanyl." (Appellant's App. Vol. II, p. 26). Mother has overdosed three times, with the most recent overdose in 2021, which required the administration of Narcan.

[6]　　At some point in 2021, Mother completed a seven-day detox program at Valle Vista. On June 6, 2022, Mother participated in a substance abuse assessment with Katherine Brumfield (Therapist Brumfield). Mother reported that she commenced using marijuana when she was sixteen years old, "snorting three times a week when she gets sick." (Transcript p. 21). She reported using heroin daily for a month, with her last use the day before the assessment. Therapist Brumfield diagnosed Mother with "opioid use disorder, severe" due to her history of prolonged heroin use. (Tr. p. 23). Brumfield recommended that Mother participate in a detox facility, with an outpatient treatment, life skills, recovery coaching, and medically assisted treatment.

[7]　　On December 29, 2022, Mother commenced a five-to-seven-day detox program at Valle Vista. At her intake, she reported her last heroin and Xanax use as being on December 29—the day she started the program. She further advised that she inhaled 1 to 1.5 grams of heroin daily, took Xanax three times a week, and drank a pint of alcohol twice a week. At the time of her discharge, Valle Vista arranged for Mother to be seen for outpatient treatment. Mother did not follow-up on this recommendation and instead began using illegal drugs, testing positive for fentanyl in February 2023, and again admittedly using within one week of the termination of parental rights hearing. Mother's longest period of sobriety was three months. She did not always submit to drug screens during the CHINS proceeding and had missed 309 calls for screening. When she did submit to a drug screening, Mother consistently tested positive for fentanyl and

some of her screens were also positive for 6-acetylmorphine, buprenorphine, and cocaine.

[8] Father participated in "a portion of" a substance abuse assessment in June 2022 with Nikkia O'Bannon (Therapist O'Bannon). (Appellant's App. Vol. II, p. 26). Father reported using fentanyl for the past year and while he did not actively seek out fentanyl, he knew that it would "be in his heroin." (Tr. p. 118). His last reported use before the assessment was June 7, 2022, and he explained that he used "due to boredom and needing to get a buzz." (Tr. p. 118). He advised that he overdosed approximately three years earlier. Therapist O'Bannon diagnosed Father with opiate use disorder severe and noted her "concern for [Father's] multiple positive fentanyl screens during the CHINS proceedings and admission that he uses heroin daily." (Appellant's App. Vol. I, p. 26). When Therapist O'Bannon recommended inpatient treatment, Father was not receptive and ended the intake assessment early. Therapist O'Bannon provided Father with Narcan when he left.

[9] Father, like Mother, was admitted to Valle Vista for detox on December 29, 2022. During his intake assessment, Father reported using Xanax and fentanyl for the last three years and was, at that time, using fentanyl daily. After his discharge from Valle Vista during the first week in January2023, Father was directed to commence substance abuse treatment. Although he made an appointment to be seen at IU Health, he missed the appointment and rescheduled it. Meanwhile, Father tested positive for fentanyl in February 2023. Father's longest period of sobriety was three months. Like Mother,

Father did not consistently submit to drug screens, having missed 246 calls for screens.

[10]     Throughout these proceedings, Parents experienced housing instability. They resided in three different homes and at the time of the termination hearing, they lived in a two-bedroom apartment owned by their friends. Parents did not advise DCS about their address. Although Parents commenced home-based services, they did not keep all their appointments and they did not meet their home-based goals, which included obtaining a driver's license, maintaining sobriety, securing stable housing, and meeting financial stability. Mother was unemployed at the time of the hearing; her most recent job lasted a month and a half. Father worked in construction, but his work was "slow lately." (Tr. p. 85). Parents relied on Father's mother for financial support.

[11]     By the time of the termination hearing, Children had been placed with Grandmother for eighteen months. Grandmother had bonded with Children and Children were comfortable in her care. Grandmother and N.L. attended counseling services together to learn communication skills. Before therapy, N.L threw emotional fits, and had displays of anger, aggression, and dysregulation. After therapy, N.L. now turns to Grandmother for comfort and continuity when she is struck with emotion. A.L.'s only therapeutic need is speech therapy.

[12]     At the CFTM held on September 2, 2022, Family Case Manager (FCM) Jennifer Pace (FCM Pace), CASA, Parents, and Grandmother discussed

permanency options for Children, including adoption and guardianship. According to FCM Pace, DCS "left that sort of with [Grandmother] and how [she] wanted to proceed" and DCS "would have been okay with a guardianship, should that have been what [she] wanted to do." (Tr. p. 155). FCM Pace noted that "after discussing and [Grandmother] doing her own research between the two, [she] was the one that if we changed [sic] the permanency plan to adoption, that she would like to adopt [C]hildren." (Tr. p. 156). Grandmother came to the CFTM prepared "with her own letter stating that she wanted it filed with the court." (Tr. pp. 156-57). This letter, written by Grandmother on September 1, listed the pros and cons of guardianship and adoption and discussed Grandmother's decision of wanting to pursue adoption. The September 1, 2022 letter was filed on September 8, 2022 as part of FCM Pace's status report to the trial court about the CFTM.

[13] On November 4, 2022, DCS filed its petition to terminate Parents' parental rights to Children. The trial court conducted a hearing on DCS's petition on January 27, March 10, and April 18, 2023. During the hearing, FCM Vicki Strunk (FCM Strunk), who managed the case except for the period from July 29, 2022 through September 8, 2022, advised the trial court that Parents had not remedied the conditions that led to the removal and that Children's reunification with Parents would threaten Children's wellbeing. FCM Strunk clarified that Parents had not addressed their substance abuse issues, failed to consistently participate in recovery coaching and drug screens, and did not maintain sobriety for more than two months. When asked if she had

considered another option than adoption as the permanency plan for Children, FCM Strunk responded that she was out on leave at the time that decision was made. After she returned from leave and was apprised of the permanency plan pursued by DCS, she supported the plan of adoption. Children's CASA also opined that adoption was in Children's best interest as waiting for Parents to reach sobriety would take "many, many years[.]" (Tr. p. 195).

[14] Grandmother confirmed during her testimony that she wanted to adopt Children. She agreed that if Parents were not addicted to drugs, "[w]e wouldn't be here." (Tr. p. 46). Upon questioning, Grandmother confirmed that guardianship was discussed approximately two weeks prior to the March 10, 2023 hearing. She also stated that "someone" had explained to her what guardianship entailed. (Tr. p. 47). She elaborated that DCS had told her that Parents could terminate a guardianship and take Children back. She opined that it would be "best that there's permanently no relationship between" Parents and Children. (Tr. p. 48). She confirmed that she wanted to adopt Children and had decided against a guardianship because Parents needed to work on their recovery and, based on her own personal experience, "it takes a long time." (Tr. p. 51).

[15] After Grandmother testified, and without Parents' objection, the trial court released her. Father's counsel alerted the trial court that he might want to recall Grandmother, and the trial court responded that since the court had released Grandmother, Father would have to subpoena her. After DCS rested its case, Mother's counsel inquired with the trial court if Parents would be allowed to

recall Grandmother. Again, the trial court explained that since Grandmother had been released, a subpoena would be required. Mother's counsel stated that she understood. DCS counsel questioned the purpose of recalling Grandmother: "We've talked a lot about the letter, so I'm not sure. We've talked about guardianship. Today is not about guardianship. DCS has presented the satisfactory [plan]" as adoption. (Tr. pp. 198-99). Treating DCS's question as an objection, the trial court asked Mother's counsel why she wanted to recall Grandmother since she had already testified and had been subject to cross-examination. Mother's counsel elaborated that because Grandmother's letter was not in evidence and the letter came up after Grandmother had testified, counsel wanted to rebut some of the evidence that had been admitted since her testimony. Denying the request, the trial court explained that discovery had been exchanged and there had been "plenty of notice." (Tr. p. 199). Mother's counsel then intended to recall FCM Pace. DCS objected based on relevancy if Mother's intent was to question her on the guardianship. The trial court overruled the objection, allowed FCM Pace to testify, and informed DCS that it could object during FCM Pace's testimony.

[16] Upon being recalled, FCM Pace again testified that Grandmother brought a letter to the September 2, 2022 CFTM. She did not remember whether she advised Grandmother that "if [P]arents chose, they could terminate the guardianship at any time without being obligated to complete the tasks needed for reunification, thus placing [C]hildren in potential danger." (Tr. p. 203). Mother's counsel asked if seeing the letter would refresh her recollection, to

which FCM Pace responded affirmatively. DCS objected, "I don't think it's refreshing her recollection as to what she said. She's trying to refresh her recollection as to someone else's letter. I'm not sure how it's even relevant." (Tr. p. 204). The trial court sustained the objection. Mother then made an offer of proof:

> She had referred earlier to a letter from [Grandmother]. We have the copy of that letter and the letter states, if the parents so choose, they can terminate guardianship -- terminate at any time, referring to guardianship, before or at the end of the deadline agreed upon. In this case, the [P]arents are not obligated to complete the tasks given them for reunification per DCS, thus putting [C]hildren in potential danger. So I wanted to ask FCM Pace if this was the letter she had referred to earlier and if she had given that advice to FCM Clark or not FCM Clark, I apologize, [Grandmother] and I believe her answers would be yes to both those questions.

(Tr. p. 206). DCS stated, "I think she said no[.]" (Tr. p. 206). The trial court noted, "She said she did not recall," and then asked FCM Pace if this was correct. (Tr. p. 206). FCM Pace replied, "I didn't offer that advice," and the trial court responded, "Okay." (Tr. p. 206). Father's counsel objected to FCM Pace's response, and both Parents moved to strike FCM Pace's answer. The trial court did not rule on the motion.

[17]   Father's counsel requested the trial court to take judicial notice of Grandmother's letter that was filed in the CHINS case as an attachment to the CFTM to supplement Mother counsel's offer of proof. DCS objected, arguing that there had been a discussion with Grandmother during her testimony which

had covered guardianship versus adoption. DCS added that Grandmother "made her stance clear. I'm not sure the letter is going to add anything." (Tr. pp. 207-08). The trial court refused to take judicial notice of the letter.

[18] On April 25, 2023, the trial court entered its findings of fact and conclusions thereon, terminating Parents' rights to Children, concluding, in pertinent part that:

> There is reasonable probability that: a. The conditions which resulted in [Children's] removal and continued placement outside the home will not be remedied; or b. Continuation of the parent-child relationship poses a threat to [Children's] wellbeing.
>
> Termination of parental rights is in [Children's] best interests.
>
> There is a satisfactory plan for the care and treatment of [Children] that being adoption.

(Appellant's App. Vol. II, p. 29).

[19] Parents now appeal. Additional facts will be provided if necessary.

## DISCUSSION AND DECISION

### I. *Admission of Evidence*

[20] Parents, together or separately, challenge three evidentiary rulings made by the trial court with respect to Grandmother's September 1, 2022 letter. Specifically, Parents challenge the trial court's denial of Mother's request to refresh FCM Pace's recollection with Grandmother's September 1, 2022 letter; Mother

contests the trial court's denial of Father's request to take judicial notice of the letter for the purpose of appeal; and Mother contends that the trial court erred by not permitting her to recall Grandmother. Finally, Mother maintains that the trial court's refusal to recall Grandmother violated her due process rights.

Our standard of review of a trial court's admission or exclusion of evidence is an abuse of discretion. *In re Des. B.*, 2 N.E.3d 828, 834 (Ind. Ct. App. 2014). A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* An error excluding evidence is harmless if "its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights." *Tunstall v. Manning*, 124 N.E.3d 1193, 1200 (Ind. 2019). When making this determination, we consider the evidence's likely impact on a reasonable, average jury. *Id.* "Likewise, reversible error cannot be predicated upon the erroneous admission of evidence that is merely cumulative of other evidence that has already been properly admitted." *In re Des. B.*, 2 N.E.3d at 834.

A.  *Refreshing Recollection*

Mother and Father separately argue—and DCS now agrees—that the trial court abused its discretion by sustaining DCS's objection to Mother's attempt to refresh FCM Pace's recollection with Grandmother's letter of September 1, 2022 as to whether FCM Pace had advised Grandmother of the legal ramifications of a guardianship versus adoption.

[23] Indiana Evidence Rule 612(a) allows a questioner to refresh a witness's memory using a writing or similar device after the witness indicates she has no memory of the information sought. *Thompson v. State*, 728 N.E.2d 155, 160 (Ind. 2000). The item used to refresh the witness's memory does not need to have been written by the witness. *Id.* *See also Cole v. State*, 970 N.E.2d 779, 781 (Ind. Ct. App. 2012) (defendant sought to refresh a witness's memory with a writing prepared by a nurse who had met with the witness). Although we find that the trial court abused its discretion by refusing to allow Mother to refresh FCM Pace's recollection with Grandmother's letter, we conclude that the refusal does not amount to a reversible error as the evidence sought to be admitted—that FCM Pace may have advised Grandmother that Parents could terminate a guardianship—was cumulative of Grandmother's earlier testimony. Prior to FCM Pace being called to the stand, Grandmother had testified that "someone" at DCS had explained to her what a guardianship entailed. (Tr. p. 47). During cross-examination by Father, she confirmed that DCS had informed her that a guardianship was not permanent, and that Parents could terminate the guardianship. Grandmother advised the trial court that she wanted to adopt Children and had decided against a guardianship because Parents needed to work on their recovery and based on her own personal experience, "it takes a long time." (Tr. p. 51). Accordingly, any perceived error in the exclusion of FCM Pace's testimony was harmless and did not affect Parents' substantial rights. *Tunstall*, 124 N.E.3d at 1200.

B. *Judicial Notice*

Mother—but not Father—maintains that the trial court abused its discretion when it denied Father's request to take judicial notice of Grandmother's September 1, 2022 letter. Evidence Rule 201 "permits courts to take judicial notice of certain material, including facts not subject to reasonable dispute and facts readily determined from sources whose accuracy cannot be questioned." *Horton v. State*, 51 N.E.3d 1154, 1160 (Ind. 2016). Rule 201 also permits courts to take judicial notice of "records of a court in this state." *Id*. In the context of termination proceedings, we have explained that a court may take judicial notice of the CHINS proceedings. *In re D.K.*, 968 N.E.2d 792, 796-97 (Ind. Ct. App. 2012). Father made his request to judicially notice Grandmother's letter as part of Mother's offer to prove, not to judicially notice any facts contained in the letter but for "the single purpose of supporting and making [Mother's] offer to prove complete and the appeal complete." (Tr. p. 209).

On October 19, 2023, Mother filed with this court a motion for leave to file a supplemental appendix in which she requested this court to take judicial notice of Grandmother's letter and to permit her to file a supplemental appendix containing a copy of the letter. As Mother merely offered the document to aid in this court's review and the document was not proffered to fill evidentiary gaps in the trial record, we granted Mother's motion and took judicial notice of Grandmother's letter. *See Banks v. Banks*, 980 N.E.2d 423, 426 (Ind. Ct. App. 2012) ("Indiana Evidence Rule 201(f) does provide that judicial notice may be taken at any stage of the proceeding, which includes appeals."). Accordingly, Mother's claim of error is now moot.

## C. *Recalling Grandmother*

Next, Mother contends that the trial court abused its discretion when it refused her request to recall Grandmother to the stand after she had been released by the trial court. The decision whether to permit the recall of a witness is within the trial court's sound discretion. *Byrd v. State*, 707 N.E.2d 308, 311 (Ind. Ct. App. 1999).

Mother explains that she "wanted to recall [Grandmother] to address new information that came out subsequent to [Grandmother's] testimony – specifically, the September letter." (Appellant Mother's Br. p. 27). However, Grandmother's September 1, 2022 letter was not new evidence. While the letter was first mentioned through FCM Pace's testimony, the letter had been filed with the trial court by DCS as an attachment to its progress report, on September 8, 2022. The record reflects that at the January 9, 2023 pretrial hearing, Father's counsel reported that he had received discovery consisting of approximately 1,200 pages. Neither Mother nor Father dispute that the September 1, 2022 letter was discovered to them. Thus, by March 10, 2023, when Grandmother testified in the termination proceeding, Mother's counsel, who had also been Mother's counsel in the CHINS proceedings, had received notice of Grandmother's September 1, 2022 letter. Therefore, by the time FCM Pace testified as to the existence of the letter, the record established that discovery had been completed, the letter had been filed in the CHINS case well before Grandmother's testimony, and Grandmother had been subject to two rounds of cross-examination by Parents' respective counsel about her decision

to pursue adoption in lieu of guardianship. Accordingly, we cannot say that the trial court's decision is against the logic and effect of the facts and circumstances before the court. *See id., see also Clark v. State*, 668 N.E.2d 1206, 1208 (Ind. Ct. App. 1996) (no abuse of discretion when the party seeking to recall had the opportunity to elicit the requested testimony).

### D. *Due Process Rights*

[28] Lastly, Mother contends that the trial court's refusal to allow her to recall Grandmother to the stand and question her about her understanding of guardianship proceedings resulted in a denial of Mother's due process rights to cross-examine witnesses. However, while Mother raised an evidentiary claim about recalling Grandmother as a witness, Mother never raised this concern as a due process claim before the trial court. As she now raised her due process argument for the first time on appeal, her argument is waived for our review. *See In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016) (party on appeal may waive a constitutional claim, including a claimed violation of due process rights, by raising it for the first time on appeal).

### II. *Termination of Parental Rights*

### A. *Standard of Review*

[29] Parents challenge the trial court's termination of their parental rights to Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their

children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (quoting *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006)).

[30] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

B. *Disjunctive Statutory Conclusions*

In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85,

92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to be highly probable." *Id.*

[32] Here, the trial court generally concluded—without making any specific, tailored conclusions—that the facts, as enumerated in its Order, supported that

> There is reasonable probability that: a. The conditions which resulted in [Children's] removal and continued placement outside the home will not be remedied; or b. Continuation of the parent-child relationship poses a threat to [Children's] wellbeing.

(Appellant's App. Vol. II, p. 29). Father—but not Mother—contends that by solely tracking the statutory language in its conclusion and not specifying which of the two prongs of Indiana Code section 31-35-2-4(b)(2)(B) applied, the trial court rendered Father's constitutional right to one appeal illusory because it prevented him from making a cogent argument and impaired appellate review.

[33] We have previously held in *In re A.K.*, 924 N.E.2d at 220, that:

> We believe that a judgment terminating the relationship between a parent and child is impossible to review on appeal if it is nothing more than a mere recitation of the conclusions the governing statute requires the trial court to reach. Indiana's parents and children deserve more, and the basic notions of due process inherent in our system of justice demand more.
>
> Trial courts are required by statute to enter findings of fact and conclusions of law in CHINS proceedings. Likewise, findings of fact and conclusions of law are required in grandparent visitation proceedings. Proceedings to terminate parental rights touch interests at least as fundamental as those regarding CHINS and grandparent visitation. We hold today that our courts must treat

them accordingly, with the constitutional gravity they clearly
have, and enter findings of fact that support the entry of the
conclusions called for by the Indiana statute and common law.

In *In re* A.K., the trial court's order merely recited the statutory requirements for termination and did not include any findings of fact to support those conclusions. *Id*. at 217. We remanded to the trial court for the entry of factual findings to support its order. *Id*.

[34] Here, however, the trial court, through the inclusion of sixty-seven detailed findings of fact, did include its overarching concerns leading to its decision to terminate Parents' parental rights. While we caution trial courts to refrain from using the statutory language *verbatim* without the inclusion of more detailed conclusions, the trial court's findings provide us with enough information to review whether the trial court based its judgment to terminate the parental rights on proper considerations. Consequently, we will address Parents' argument in light of the Trial Rule 52 standard of review rather than remand for the entry of a new order. *See also In re M.W*., 942 N .E.2d 154, 159-60 (Ind. Ct. App. 2011) (the omission of the conclusion that termination was in the child's best interest does not warrant remand to the trial court for the entry of a new order).

C. *Reasonable Probability*

[35] In a continuation of his previous argument, Father contends that given his efforts over the lifetime of the CHINS case to get treatment for his drug

addictions and the general acknowledgement that addicts often make multiple efforts to achieve and maintain sobriety, the trial court's conclusion that Father would not remedy the circumstances that led to the removal of Children was not clearly and convincingly supported by the evidence.

[36] It is well-established that "[a] trial court must judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied*. In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment. *McBride v. Monroe Cnty. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's failure to respond to services. *Lang v. Starke Cnty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait until the child[] [is] irreversibly influenced by [its] deficient lifestyle such that [its] physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id*. Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[37] In adjudicating Children as CHINS, the trial court determined that Children's removal from Parents' care was necessary due to Parents' history of heroin abuse, Parents were evicted from their home, and Parents were admitted to the hospital on October 7, 2021 due to suspected overdoses. Throughout these proceedings, Father consistently tested positive for illegal substances when he submitted to drug screens, including his fentanyl positive screen in February 2023 during the termination proceedings. Father, who was diagnosed with severe opiate use disorder, participated in some services, including a partial substance abuse evaluation. However, when Father was apprised of the recommendations resulting from this evaluation, he left before completing the assessment. Father never reached his goal of maintaining sobriety; at most, he remained sober for three months. Although he completed a detox program at Valle Vista in late December 2022, by the time of the termination hearing, he had yet to complete the recommended aftercare treatment, he had not completed an inpatient program that he planned to attend and he continued to test positive for illegal substances.

[38] Father's failure to engage in services during these proceedings demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002). Our supreme court has previously concluded that "parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Despite DCS's referral to services to treat Father's addictions, Father refused to participate, continually screening positive for illegal substances.

[39]   Father's citations to his own testimony in which he acknowledged his addiction, his insight into his drug use, and his desire to complete a longer substance abuse treatment program merely amount to impermissible requests for this court to reweigh and judge anew witness credibility. *See K.T.K.*, 989 N.E.2d at 1229. Similarly, Father's reliance on FCM Strunk's testimony that she was "not in a rush personally" to terminate parental rights disregards the numerous emphases by FCM Struck to the contrary that the case had been open seventeen months and Children had waited long enough. The trial court was entitled to weigh the evidence as it found appropriate in the context of this case, and we affirm the trial court's conclusion that a reasonable probability exists that the conditions that resulted in Children's removal will not be remedied. *See id.* As such, we affirm the trial court's decision.[3]

D.  *Best Interests of Children*

[40]   Both Father and Mother separately challenge the trial court's conclusion that termination is in Children's best interests. To determine whether termination is in a child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. The court must subordinate the interests of the parents to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child

---

[3] Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and we affirm the trial court's termination based on the conclusion that there is a reasonable probability that Father would not remedy the reasons for Children's removal or placement outside the home , we will not address Father's argument that the continuation of the parent-child relationship poses a threat to Children.

relationship. *Id.* In this regard, "recommendations by both the case manager and the child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*. Here, FCM Strunk and CASA both supported the termination of Parental rights and adoption by Grandmother. CASA opined that waiting for Parents to achieve sobriety was not in Children's best interests as it could take "many, many years." (Tr. p. 194).

[41] In support that termination is not in Children's best interests, Mother offered a three-fold argument: 1) the strong bond between parent and Children; 2) the lack of any identified benefit from termination; and 3) the ready availability of a less restrictive alternative. Although we acknowledge that Parents share a bond with Children and the loving relationship was evident during visitation, Mother testified that due to her addiction, she wanted Children to remain with Grandmother. She advised that she could not say when she will be sober and have the ability to provide a safe environment for Children.

[42] Mother refers this court to jurisprudence "where a reviewing court reversed a termination when the evidence demonstrated that the parent had an ongoing, positive relationship with the child" and termination was not in the child's best interests. (Appellant Mother's Br. p. 19). However, these cases are inapposite to the situation at hand. In *In re G.Y.*, 904 N.E.2d 1257, 1263 (Ind. 2009), the incarcerated mother had taken substantial steps to improve her life, including

completing drug rehabilitation programs and individualized drug counseling, she signaled a strong willingness and commitment in maintaining a parental relationship with child, and she continued to participate in parenting and other personal improvement programs after her release. *Id.* at 1264. In *Matter of B.F.*, 141 N.E.3d 75, 76 (Ind. Ct. App. 2020), mother and children were bonded, mother's parenting skills were appropriate, and the only lingering issue was mother's lack of stable and suitable housing. In *In re H.G.*, 959 N.E.2d 271, 293 (Ind. Ct. App. 2011), the court concluded that parents had made significant efforts at self-improvement, the children had been placed in a new foster home shortly after termination, and no adoptive family had been identified.

[43] None of the considerations that warranted a reversal of the termination based on the best interests of the child in *In re G.Y.*, in *Matter of B.F.*, and in *In re H.G.*, are present here. Parents made no progress in their fight against their addiction—they could not even produce a single negative screen. Even tough Parents made an effort to attend and participate in some classes, there is no evidence in the record that either Parent successfully completed a court-ordered service. Parents did not demonstrate any commitment or interest in bettering themselves for the benefit of their Children.

[44] Permanency is a central consideration in determining the best interests of a child. *In re G.Y.*, 904 N.E.2d at 1264. At the time of the termination hearing, Children had been with Grandmother for eighteen months—which was half of A.L.'s life. Children have bonded with Grandmother and N.L. is getting the necessary counseling services to address her communication and emotional

issues. With Mother diagnosed with severe opiate addiction and still testing positive for illegal substances during the termination proceedings, there is no possible date in sight to commence a reunification attempt with Mother and, as such, there exists no permanent stability. "Termination, allowing for a subsequent adoption, would provide [Children] with the opportunity to be adopted into a safe, stable, consistent, and permanent environment where all their needs will continue to be met, and where they can grow." *In re A.D.S.*, 987 N.E.2d at 1159.

[45] Father, in a somewhat similar vein, contends that the trial court overemphasized permanency, and that delaying permanency would not harm Children. Because he maintained a bond with Children, and considering that Children would remain in Grandmother's care, he argues that he should be given additional time to straighten out his life given that he had taken positive steps and shown insight in his addiction patterns. In support, Father relies on *In re R.S.*, 56 N.E.3d 625 (Ind. 2016). In *In re R.S.*, our supreme court acknowledged that "when a child is in relative placement, and the permanency plan is adoption into the home where the child has lived for years already, prolonging the adoption is unlikely to have an effect upon the child. Further, even when a father has had a troubled past and failings as a parent, our courts will also recognize the positive steps a father has taken to turn his life around for the sake of himself and his children." *Id.* at 630 (internal citations omitted). Referencing the loving bond that R.S. and father shared, father's successful completion of multiple self-improvement and parenting courses, father's

successful completion of probation, his repeatedly expressed desire to parent R.S., and his exercise of regular visitation with R.S., the court reversed the trial court's conclusion that termination was in the child's best interest, as the court did "not believe that this case has reached the last resort stage." *Id.* at 631. To the contrary here, Father has not undertaken a single positive step to either better himself or to be a positive influence for Children. There is not a single negative drug screen—if Father bothered to submit to drug screens in the first place—Father did not complete a single court-ordered class, and Father did not find stable employment, an appropriate home, or achieve financial independence. Although Father did visit Children, Father did not demonstrate the slightest improvement in any area of his life.

[46] In a related argument Father also contends that termination is not in Children's best interests because Grandmother expressed a desire for Children to have a continued family relationship with Parents. However, the record reflects that Grandmother unequivocally testified that she "want[ed] to adopt the children" and she "want[ed] them to stay with [her] forever." (Tr. p. 50). She decided against guardianship because it was not a permanent solution and she advised "it would be better for [C]hildren if there was no legal family relationship between [C]hildren and their [P]arents" because "under the circumstances right now, [] they need to concentrate on themselves[.]" (Tr. p. 48). Grandmother did inform the court that, after adoption and if Parents , in the future, did recover, Parents "could be part of the family" through visitation. (Tr. p. 51).

We remind Parents that we evaluate the trial court's order to terminate parental rights in the light of the best interests of Children—not the best interests of Parents. The evidence overwhelmingly reflects that Parents failed to avail themselves of the opportunities and services offered by DCS to reunite with Children and made no progress nor commitment during the proceedings of the case. "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification." *In re E.M.*, 4 N.E.3d at 648. Even though "the ultimate purpose of the law is to protect the child, the parent-child relationship will give way when it is no longer in the child's best interest to maintain this relationship." *In re B.D.J.*, 728 N.E.2d 195, 200 (Ind. Ct. App. 2000). Parents' inability to address their addiction and to provide a safe environment for Children, together with their lack of participation in services requested by DCS, supports the trial court's conclusion that termination of Parents' parental rights is in the best interests of Children. Accordingly, we affirm the trial court's decision.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion by refusing to admit certain evidence requested by Parents and that DCS presented sufficient evidence to support its petitions to terminate the parent-child relationship.

Affirmed.

Crone, J. and Mathias, J. concur